# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | | |
|---|---|---|
| EUGENE WU, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 2:21-cv-02205-JTF-atc |
| | ) | |
| PASSIVE WEALTH BUILDERS, LLC, et al., | ) | |
| | ) | |
|     Defendants. | ) | |

| | | |
|---|---|---|
| ANASTASSIA DROFA, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 2:22-cv-02191-JTF-atc |
| | ) | |
| PASSIVE WEALTH BUILDERS, LLC, et al., | ) | |
| | ) | |
|     Defendants. | ) | |

**ORDER GRANTING CONSOLIDATED MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING LEAVE TO FILE MOTION FOR ATTORNEY'S FEES**

    Before the Court is Plaintiffs Eugene Wu and Anastassia Drofa's Consolidated Motion for Partial Summary Judgment and Consolidated Motion for Default Judgment, filed on January 12,

1

2024. (ECF No. 83.)[1] As of the date of this Order's entry, Defendants have not filed a response or motion for extension of time to file a response, and the time to do so has long passed. Hence, the Court considers Plaintiffs' Motion to be unopposed, and evaluates it accordingly. For the reasons set forth below, Plaintiffs' Consolidated Motion for Partial Summary Judgment is **GRANTED**. Plaintiffs are **DIRECTED** to file the relevant documents for their fee request within 14 days of the date of this Order's entry.

## I. FACTUAL BACKGROUND[2]

Defendant Joshua Jackson is the sole owner of co-defendant business Zane and is a 50% stakeholder in co-defendant business PWB. (ECF No. 84, 1.) With respect to PWB, he was responsible for operations, marketing, sales, and managing employees. (*Id.*) He did not invest any capital into PWB. (*Id.*) Jackson solicited Plaintiffs for loans on behalf of PWB, claiming that the funds would be used to purchase residential real properties which would be refurbished and sold at a profit that would then be split between PWB and the individual plaintiff. (*Id.* at 2.) He made this same representation to his business partner, Arnold Todd Yarger, who owned the other 50% of PWB. (*Id.* at 2-3.) He explicitly stated that these loans would be used for particular properties as opposed to being pooled with the funds of other investors. (*Id.* at 2.)

Relying on these representations, Eugene Wu lent defendant Passive Wealth Builders, LLC ("PWB") $500,000 pursuant to a note ("Wu's PWB Note") on September 16, 2019. (*Id.*) Wu's PWB Note guaranteed him a twelve percent interest rate for a one-year repayment period running from September 16, 2019, to September 17, 2020, with principal and interest due at the end of that

---

[1] The cases were formally consolidated. Nevertheless, Plaintiffs filed the same consolidated Motion, Memorandum of Law in Support, and Statement of Undisputed Facts on both dockets. (*See Wu v. Passive Wealth Builders, LLC, et al*, No. 2:21-cv-2205-JTF-atc, ECF Nos. 83-85 & *Drofa v. Passive Wealth Builders, LLC, et al*; No. 2:22-cv-02191-JTF-atc, ECF Nos. 59-61.) For simplicity's sake, the Court internally refers to the documents by their docket numbers on the earlier filed case, *Wu* v. *Passive Wealth Builders*, *LLC et al.,* in this Order, unless otherwise specified.

[2] Because Defendants did not respond to Plaintiffs' Statement of Undisputed Materials Facts, the following facts from ECF No. 84 are deemed admitted for the purposes of this Motion. (See LR 56.1(d); Fed. R. Civ. P. 56(e)(2).)

2

period. (*Id.*) Wu's PWB Note further guaranteed a twelve percent interest rate past any point of default. (*Id.*) If PWB were ever over 5 days late on a payment, the note provided for a five percent late charge fee and a $25 per day late fee for every calendar day a payment was not made. (*Id.*) Wu also loaned defendant Rocketsell, LLC, $250,000 on June 18, 2020, pursuant to a note ("the RocketSell Note") with an identical late fee structure, although it provided for a flat $2,500 per month interest payment. (*Id.*) The Rocketsell Note also anticipated the principal would be used to acquire real estate, and defendant Joshua Jackson represented that at least one home had been purchased with the lent money. (*Id.*) Both notes allowed for the recovery of attorney's fees. (*Id.*)

Anastassia Drofa lent PWB $150,000 pursuant to a note ("Drofa's PWB Note") on February 7, 2020. (*Id.*) Drofa's PWB Note guaranteed her a twelve percent interest rate for a one-year repayment period running from February 7, 2020, to February 12, 2021, with principal and interest due at the end of that period. (*Id.*) Drofa's PWB Note further guaranteed a twelve percent interest rate past any point of default. (*Id.*) If PWB were ever over 5 days late on a payment, the note provided for a five percent late charge fee and a $25 per day late fee for every calendar day a payment was not made. (*Id.*) Drofa lent PWB, along with Defendant RocketSell, LLC, an additional $100,000 on March 12, 2020, and another $180,000 on August 27, 2020, with both loans subject to the same terms as the original PWB Note. (*Id.*) The notes also provide for the recovery of attorney's fees. (*Id.*)

Plaintiffs were both given access to an internet portal that purportedly tracked their investments. (*Id.*) Both portals represented that Wu and Drofa's investments were used to purchase a property located at 714 Westmount Avenue, in Dallas, Texas. (*Id.*) Specifically, the portal indicated that Drofa had $150,000.00 invested in the property and Wu had $190,000.00. (*Id.* at 7.) Wu received a partial principal repayment totaling $100,000.00 in September, 2019, note but has

not received any payments or interest on either note since January, 2021. (*Id.*) Drofa has not received any interest or principal payments since September, 2020. (*Id.*)

In January 2021, Yarger discovered that despite Jackson's sales pitch statements about how Plaintiffs' funds were used and the portal's similar representations, none of the properties were financed by individual investors' funds. (*Id.* at 3.) Instead, Jackson was using bank loans to finance most of the property acquisition costs. (*Id.*) The HUD-1 Settlement Statement for the Westmount property reflects that a bank was the only lender for this property's purchase.[3] (*Id.* at 6.) Notwithstanding the fact that some of the notes that Wu and Drofa signed off on were made payable to RocketSell, all of the money was deposited into PWB's account and logged as debts of PWB. (*Id.* at 3.) Forrest Skufca, a PWB employee from June, 2018 to December, 2020, testified that Jackson created RocketSell, SmartRezi, and the other LLCs for the purpose of controlling "each part of the process." (*Id.* at 5.) However, he noted that these separate entities "never got off the ground." (*Id.*)

Jackson withdrew money from the account containing Plaintiffs' investments to pay for two Tesla cars, trips, entertainment, and living expenses. (*Id.* at 3.) Jackson had informed Zac Piasecki, the bookkeeper for Brite Solutions and PWB, that there was no specific use for the money that investors lent to him. (*Id.* at 6.) PWB did not have the funds to pay its employees without using the money it received from investors. (*Id.* at 3-5.) Per Piasecki's testimony, PWB's books indicate that Wu is owed $750,000.00 and Drofa is owed $290,000.00. (*Id.* at 7.) These numbers

---

[3] The subject properties were what is known as "HUD homes." This refers to a 1 to 4-unit residential property acquired by the U.S. Department of Housing and Urban Development as a result of a foreclosure action on a Federal Housing Administration-insured mortgage. HUD becomes the property owner and offers it for sale to recover the loss on the foreclosure claim. *See* U.S. Department of Housing and Urban Development, https://www.hud.gov/program_offices/housing/sfh/reo (last accessed March 14, 2024). A HUD-1 Settlement Statement is "a document that lists all charges and credits to the buyer and to the seller in a real estate settlement, or all the charges in a mortgage refinance." Consumer Financial Protection Bureau, https://www.consumerfinance.gov/ask-cfpb/what-is-a-hud-1-settlement-statement-en-178/ (last accessed March 14, 2024).

do not reflect the additional $180,000.00 Drofa wired directly to Zane. (*Id.*) According to Piasecki's bookkeeping, Zane withdrew $263,397,77 from PWB's accounts. (*Id.*)

## II.     PROCEDURAL HISTORY

Wu commenced his securities fraud action against Jackson, PWB, and RocketSell on April 2, 2021. (ECF No. 1.) On March 25, 2022, Wu filed an Amended Complaint which added defendants Zane, Brite, SmartRezi, StreetDivvy, and Yarger. (ECF No. 17, 1-2.) Therein he asserts five claims. He brings one breach of note claim against PWB and another against RocketSell seeking unpaid principal and interest, as well as reasonable attorney's fees and expenses. (*Id.* at 7-8.) Wu also seeks to pierce the corporate veil of RocketSell and PWB to reach Jackson's assets. (*Id.* at 8-9.) He argues that this is necessary because Jackson has grossly undercapitalized RocketSell and PWB and moved all relevant assets to himself or other entities. (*Id.*) Wu brought another veil piercing claim directed at the PWB and Brite entities for the purposes of reaching Yarger.[4] (*Id.* at 9-10.) Last, he alleges that all defendants violated three sections of the Tennessee Securities Act of 1980; Tenn. Code Ann §§ 48-1-121 & 122 (a), (g). (*Id.* at 10-12.) Drofa filed a substantively nearly identical complaint against the same defendants on March 28, 2022. (*See Drofa v. Passive Wealth Builders, LLC, et al*; No. 2:22-cv-02191-JTF-atc, ECF No. 1.)

On July 6, 2022, Jackson submitted a *pro se* Answer to Drofa and Wu's Complaints. (ECF No. 19.) Jackson asserted that his Answer was also submitted on behalf of codefendants PWB, RocketSell, Zane, Smartrezi, and StreetDivvy, the corporate entities that he owns or manages. (*Id.* at 1 & 9.) During the November 16, 2023 Status Conference, the Court informed Jackson that he

---

[4] Plaintiffs reached a settlement with Yarger, and filed a Motion to Dismiss him and Brite on February 5, 2024. (ECF No. 88.) On February 8, 2024, the Court granted the Motion, thereby terminating Yarger and Brite as defendants in this action. (ECF No. 89.)

5

could not represent his companies, and required that counsel for the businesses be retained by Wednesday, November 22, 2023. (ECF No. 81.) Jackson failed to do so.

Plaintiffs then filed their Consolidated Motion for Partial Summary Judgment and Consolidated Motion for Default Judgment on January 12, 2024. (ECF No. 83.) Under the local rules of this district, a response was due 28 days after the Motion was served. LR 56.1. Thus, a response was due on Friday, February 9, 2024. None of the remaining defendants filed a timely response.

Defendants' inaction and failure to comply with court orders has been a recurring issue for nearly three years. Thus, the Court entered an Order to Show Cause on both dockets on February 12, 2024. (ECF No. 90.) That Order required that Jackson appear at the upcoming status conference set for February 13, 2023. (*Id.* at 3.) It also set forth a February 26, 2024 deadline to retain counsel for the LLC defendants, and file either a response to the Consolidated Motion for Partial Summary Judgment and Default Judgment or a motion for extension of time to file a response. (*Id.* at 3.) Last, the Order to Show Cause explicitly warned Defendants that failure to comply would result in the Court reviewing the pending motions to determine the base legal sufficiency of Plaintiffs' arguments and impose liability. (*Id.*) Defendants did not comply with any part of the Court's Order to Show Cause.

### III.   LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the facts in the record and reasonable inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once a properly supported motion for summary judgment has been filed, the party opposing summary judgment must show that there is a genuine dispute of material fact by pointing to evidence in the record or argue that the moving party is not entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c)(1). "When confronted with a properly supported Motion for Summary Judgment, the party with the burden of proof at trial is obligated to provide concrete evidence supporting its claims and establishing the existence of a genuine issue of fact." *Cloverdale Equipment Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 937 (6th Cir. 1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). A genuine issue of fact for trial exists if the evidence would permit a reasonable jury to return a verdict for the nonmoving party; thus, a plaintiff must produce probative evidence to create a material factual doubt. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986). The opposing party "cannot rest solely on the allegations made in [his] pleadings." *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009) (quoting *Skousen v. Brighton High Sch.*, 305 F.3d 520, 527 (6th Cir. 2002)).

Federal Rule of Civil Procedure 56 "does not embrace default judgment principles." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 242 (2d Cir. 2004). This means that even when ruling on an unopposed motion for summary judgment, the district court cannot grant the motion without considering supporting evidence and determining whether the movant has met its burden. *See Byrne v. CSX Transp., Inc.*, 541 F. App'x 672, 675 (6th Cir. 2013) (citing *Delphi Auto. Sys., LLC v. United Plastics, Inc.*, 418 Fed.Appx. 374, 380–81 (6th Cir. 2011).

## IV.   ANALYSIS

### A. Breach of Note

Plaintiffs argue that they are entitled to judgment as a matter of law on their breach of note claims. "In a breach of contract action, claimants must prove the existence of a valid and

enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." *Faulkner v. Brooks Custom Application, LLC*, No. 119CV01103STAJAY, 2019 WL 4675394, at *2 (W.D. Tenn. Sept. 25, 2019) (quoting *Federal Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011)).

i.  **Wu's Notes**

It is undisputed that Wu lent PWB a total of $750,000.00 via two loans, one for $500,000.00 and another for $250,000.00. (ECF No. 84, 2.) This was memorialized in a writing, as reflected by the two notes. (*Id.*) The first note for $500,000.00 has a 12% interest rate, while the second note for $250,000.00 provided for a $2,500.00 per month payment to Wu for each property acquired. (*Id.*) The notes also provide for a 5% flat late fee, a $25.00 per day late fee, and allow for the recovery of attorney's fees. (*Id.*) The notes are sufficient to establish the existence of two valid and enforceable contracts.

Repayment of both notes was due a year from their issuance. The first note was issued on September 16, 2019, and the second was issued on June 19, 2020. (*Id.*) It is undisputed that Wu received a partial principal repayment totaling $100,000.00, but has not received any additional payments or interest on either note since January, 2021. (*Id.*) This amount does not satisfy the principal for either note, meaning that neither note was repaid a year from its issuance. Hence, Defendants breached the contract as set forth in the notes. Wu is missing $650,000.00 of the $750,000.00 principal he initially lent, 12% interest on the first note, and $2,500.00 per month for the second note, since Jackson represented to him that at least one property had been acquired. (*See id.*)

Because Wu is entitled to judgment as a matter of law that Defendants breached the two notes, the Motion for Summary Judgment is **GRANTED** as to this claim.

8

### ii. Drofa's Notes

It is undisputed that Drofa lent a total of $430,000.00. (*Id.* at 2.) This was memorialized in a writing, as reflected in three notes. Per the first note, Drofa invested $150,000.00 with PWB on February 7, 2020. (*Id.*) The second note reflects that she invested an additional $100,000.00 with RocketSell on March 12, 2020. (*Id.*) The third note indicates that Drofa loaned $180,000.00 to Zane on August 2020. (*Id.*) Further, the notes represent that in exchange for these loans, Drofa's notes were to be paid in full one year from their issuance at a 12% interest rate, a 5% flat late fee, and a $25.00 per day late fee. (*Id.*) The notes also provide for the recovery of attorney's fees. (*Id.*) This is sufficient to demonstrate the existence of a valid and enforceable contract.

It is undisputed that Drofa has not received any principal repayment or returns on her investment. Consistent with the terms of the contract as set forth above, this is sufficient to show that Defendants breached the notes. As was the case with Wu, damages are evident since Defendants did not perform any of their obligations as described in the notes.

Because Drofa is entitled to judgment as a matter of law that Defendants breached the three notes, the Motion for Summary Judgment is **GRANTED** as to this claim.

### B. Veil Piercing

Plaintiffs argue that the corporate veil should be pierced so that they may reach the assets that Jackson himself holds. The separate identity of a corporation may be disregarded upon a showing that it is a sham, or where necessary to accomplish justice. *See Yinghong Mach. Int'l Ltd. v. Wholesale Equip., Co.*, No. 213CV02671JTFCGC, 2014 WL 12887673, at *12 (W.D. Tenn. Oct. 17, 2014) (quoting *Oak Ridge Auto Repair Service v. City Finance Co.*, 57 Tenn. App. 707, 711-712 (Tenn. 1967)). The issue of when a corporate entity should be disregarded is within the province of the trial court, although the question of when an individual should be held liable for

9

corporate obligations is largely a factual determination. *H.G. Hill Realty Co., LLC. v. Re/Max Carriage House, Inc*. 428 S.W.3d 23 (Tenn. Ct. App. 2013). Each case rests upon the facts presented. *VP Buildings, Inc. v. Polygon Group*, Case No. M2001-00613-COA-R3-CV, 2002 WL 15634, at n.1 *4 (Tenn. Ct. App. 2002).

Tennessee courts assess whether to pierce the corporate veil by reference to the following factors:

> (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

*Se. Texas Inns, Inc. v. Prime Hosp. Corp.*, 462 F.3d 666, 675–76 (6th Cir. 2006) (quoting *Oceanics Schools, Inc. v. Barbour*, 112 S.W.3d 135, 140 (Tenn.Ct.App.2003)). A plaintiff need not show that all factors are satisfied to justify the piercing of the corporate veil. *Oceanics Schools*, 112 S.W.3d at 140–41 (citation omitted).

Beginning with factor (2), it is undisputed that all the notes were deposited into PWB's account, regardless of whether they were made payable to one of the other entities. (ECF No. 84, 3.) Plaintiffs have also established that PWB did not have the funds to pay its employees without using the money it received from investors like Plaintiffs. (*Id.* at 3-5.) This is sufficient to show that the corporate entities were grossly undercapitalized. *Texas Inns, Inc*., 462 F.3d at 675–76.

Factors (6) and (7) are satisfied from the same set of undisputed facts. Jackson used employees of PWB to do work and obtain funds for his other entities. (ECF No. 84, 6.) A PWB employee also

directed Drofa to deposit one of her investments into Zane, representing that this was an "umbrella company." (*Id.* at 2.)

Factor (8) is satisfied given that wherever the invested funds were initially deposited, they were funneled through the various corporate entities until they reached Jackson's personal accounts. (*Id.* at 3, 5.)

Factors (9) and (11) are met because Jackson procured the loans by misrepresenting that the funds would be used to purchase homes and sell them for profit. (*Id.* at 2-3, 6.) It is also undisputed that Jackson continued these misrepresentations through the portal's indication that Plaintiffs' money was invested in the Westmount property. (*Id.* at 2.)

Given that the applicable factors weigh heavily in Plaintiffs' favor and failure to set aside the corporate forms would work an injustice, the Motion for Summary Judgment is **GRANTED** as to Plaintiffs' veil piercing claims.

### C. Tennessee Securities Act

Plaintiffs next argue that they are entitled to judgment as a matter of law on their securities fraud claims. They contend that Jackson's actions constitute direct violations of all three subsections of Tenn. Code Ann. § 48-1-121(a). (ECF No. 85, 6.) Tennessee Code Annotated § 48-1-121(a) provides in relevant part:

> (a) It is unlawful for any person, in connection with the offer, sale or purchase of any security in this state, directly or indirectly, to:
> (1) Employ any device, scheme, or artifice to defraud;
> (2) Make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
> (3) Engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Tenn. Code Ann. § 48-1-121(a).

The term "security" in § 48-1-121(a) means:

>any note, stock, treasury stock, bond, debenture, evidence of indebtedness, a life settlement investment or any fractional or pooled interest in a life insurance policy or life settlement investment, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such a title or lease; or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing;

Tenn. Code Ann. § 48-1-102(21)(A).

Many courts, including the Tennessee Supreme Court and the Sixth Circuit, have recognized similarities in the Tennessee Securities Act's definition of security and that in federal securities law. *See Bass v. Janney Montgomery Scott, Inc.*, 210 F.3d 577, 584 (6th Cir. 2000) (noting that the definition of "security" in the Tennessee Securities Act "closely tracks" the federal statutory definition); *King v. Pope*, 91 S.W.3d 314, 319 (Tenn. 2002) (stating that the Tennessee definition of "security" "is substantially identical to definitions contained in the federal Securities Act of 1933 and the federal Securities Exchange Act of 1934."). With respect to the federal Securities Act, the Supreme Court has explained that Congress "enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment" but did not "intend to provide a broad federal remedy for all fraud." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990) (quoting *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982)). The *Reves* court adopted a "family-resemblance" test to determine whether a particular note falls within the federal definition of "security." *Id.* at 65–67. The test begins with the presumption that a note is a security. *Id. at 67.* However, this presumption can be rebutted by a showing that the note "bears a strong resemblance" to one of seven categories of "notes" that are not "securities." *Id.* at 65.

As a threshold matter, the Court finds that Plaintiffs have shown that the notes here qualify as securities. It is undisputed that Jackson issued these notes in exchange for Plaintiffs' funds under

12

the pretense that he would use the funds to buy properties, refurbish them, then sell them and split the profits with Plaintiffs. (ECF No. 84, 2-3.) This means that the notes were sold as an investment. Thus, Plaintiffs are entitled to a rebuttable presumption that their notes are securities. *Reves*, 494 U.S. at 65, 67. Because Defendants have failed to respond, this presumption is unrebutted.

The Court turns to the merits of Plaintiffs' substantive claims under Tenn. Code Ann. § 48-1-121(a). Jackson procured loans from Drofa and Wu through his representations that he would finance property purchases with the funds and then split the sale value with them. (ECF No. 84, 2-3.) He provided Plaintiffs with internet access to the portal that purportedly tracked their investments to maintain this misrepresentation. (*Id.* at 2.) Based on the facts presented, the Court determines that the described scheme had no apparent purpose other than to defraud Plaintiffs. Plaintiffs are entitled to judgment as a matter of law under Tenn. Code Ann. § 48-1-121(a)(1). All of these claims were material to the underlying transactions insofar as they pertain to the central terms of the notes.

As Yarger and Piasecki's testimony and the HUD-1 Settlement Statements reflect, all of Jackson's statements regarding the planned use of Plaintiffs' funds were untrue. (*Id*. at 2, 6.) Thus, Jackson made these untrue material statements of fact to deceive Plaintiffs. This is a sufficient showing for establishing a violation of Tenn. Code Ann. § 48-1-121(a)(2). All of the previously described facts also demonstrate that Jackson engaged in a practice which operated to defraud Plaintiffs. Plaintiffs are therefore entitled to judgment as a matter of law as to their Tenn. Code Ann. § 48-1-121(a)(3) claim.

### D. Compensatory Damages

#### i.  Wu's Damages

The undisputed facts reflect that Wu held two notes, one dated September 16, 2019, for $500,000.00 and another dated June 20, 2020 for $250,000.00. (ECF No. 84, 2.) Wu received a partial principal repayment as to the September 16, 2019 note for $100,000.00. (*Id.*) The September 16, 2019 note has a 12% interest rate, and the June 20, 2020 note provides for a $2,500.00 per month payment to Wu for each property acquired. (Id.) Both notes also provide for a 5% flat late fee, a $25.00 per day late fee, and allow for the recovery of attorney's fees. (Id.)

On the September 16, 2019 note, the damages are $400,000.00 in principal, $141,369.86 for unpaid interest, $20,000.00 for the late fee, and $30,000 for the $25.00 daily late fee since maturity. (ECF No. 85, 7.) In total, the damages on this note are $591,369.86.

On the June 20, 2020 note, the damages are $250,000.00 in principal, $110,000.00 for the $2,500 monthly property payment, $12,500.00 for the late fee, and $23,400.00 for the $25.00 daily late fee since maturity. (*Id.*) In total, the damages on this note are $395,900.00.

The combined compensatory damages on Wu's notes are $987,569.86.

#### ii.  Drofa's Damages

Drofa holds three notes. Drofa invested $150,000.00 on the February 7, 2020 note. (ECF No. 84, 2.) She invested an additional $100,000.00 on the March 12, 2020 note. (*Id.*) On the August 2020 note, she invested $180,000.00. (*Id.*) All three of Drofa's notes were to be paid in full one year from their issuance at a 12% interest rate, a 5% flat late fee, and a $25.00 per day late fee. (*Id.*) The notes also provide for the recovery of attorney's fees. (*Id.*)

14

For Drofa's first note dated February 7, 2020, the damages are $150,000.00 in principal, $59,079.45 in interest, $7,500.00 for the flat late fee, and $24,625.00 for the daily late fee. (ECF No. 85, 7.) The total damages on this note are $241,204.45.

For her second note dated March 12, 2020, the damages are $100,000.00 in principal, $39,386.30 in interest, $5,000.00 for the flat late fee, and $24,625.00 for the daily late fee. (*Id.*) The total damages are $169,011.30.

For her third note dated August 27, 2020, she is owed $180,000.00 in principal, $70,895.34 in interest, $9,000.00 for the flat late fee, and $19,725.00 for the daily late fee. (*Id.* at 8.) The total under this note $279,620.34.

Drofa's total compensatory damages for the three notes are $689,836.09.

### E. Punitive Damages

Plaintiffs argue that Jackson's conduct warrants punitive damages. They suggest that the appropriate amount would be two times each Plaintiff's compensatory damages. (ECF No. 85, 8.) The Court first considers the propriety of awarding punitive damages before addressing the appropriate amount.

#### i. Propriety of Awarding Punitive Damages

"Punitive damages should operate to punish the defendant and deter others from like offenses." *Pruett v. Skouteris*, 743 F. Supp. 2d 718, 727 (W.D. Tenn. 2010) (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 900 (Tenn.1992) (internal quotation marks omitted). Tennessee law authorizes an award of punitive damages in "cases involving fraud, malice, gross negligence, oppression, evil motives, conscious indifference, and reckless conduct implying 'disregard of social obligations.'" *Id.* These damages should be "awarded only in the most egregious of cases."

15

*Id.* Therefore, "a court may ... award punitive damages only if it finds a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." *Id.*

Plaintiffs argue that punitive damages are warranted because Jackson's actions were malicious, intentional, fraudulent, and reckless. (ECF No. 85, 8.) In support, they point out that Jackson purposefully misled them into loaning money to PWB with promises that the funds would be used for purchasing properties to be refurbished and sold. Plaintiffs say that Jackson's true intent was to divert the funds for his own use. They also refer to his efforts to maintain this deception through the help of other employees and a website that purportedly tracked Plaintiffs' investments. (*Id.*)

The Court agrees with Plaintiffs that the intentional, calculated and malicious nature of Jackson's conduct in this case is precisely the type of conduct which warrants the award of punitive damages. Both Plaintiffs loaned Jackson substantial amounts of money in reliance on his representations and the terms set forth in the notes. Through his fraudulent representations, Jackson stole over a million dollars from Plaintiffs without any intention of performing his contractual obligations or returning even a portion of the loaned funds. Jackson's conduct was egregious, intentional, and fraudulent. Accordingly, the Court finds that punitive damages are appropriate.

### ii. Appropriate Amount of Punitive Damages

Plaintiffs maintain that the Court should award them two times their compensatory damages as punitive damages. This translates to a punitive damages award of $1,975,193.72 for Wu and $1,379,672.18 for Drofa. (ECF No. 85, 9.) The United States Supreme Court has cautioned that an award of punitive damages is subject to constitutional limitations. Pursuant to the Due Process Clause of the Fourteenth Amendment, a "grossly excessive punishment" may not be imposed on a tortfeasor. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562 (1996) (internal

quotations omitted).[5] "The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (internal quotations omitted). To determine the reprehensibility of a defendant's conduct, a court must consider whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Campbell*, 538 U.S. at 419.

Jackson stood in a special, fiduciary relationship to both Plaintiffs as the recipient of their substantial investments. Although Jackson appears to have only caused economic harm to Plaintiffs, no part of the events giving rising to this suit appear to have been accidental. Jackson's repeated deceptions demonstrate his complete disregard for Plaintiffs' financial wellbeing and his fiduciary duties. These considerations suggest that a sizeable punitive damages award is necessary to deter Jackson and the public at large from committing these acts. That said, it is important to note that the compensatory damages awarded in this case exceed one and a half million dollars. Jackson is also liable for Plaintiffs' attorney's fees and costs for bringing this action. *See infra* IV.F. With that in mind, as reprehensible as Jackson's conduct was, a punitive damages award exceeding three million dollars would be grossly excessive and almost certainly unrecoverable. In consideration of the facts described in this Order, the Court hereby awards punitive damages against Jackson for one-fourth of each Plaintiff's total compensatory damages. Wu's punitive damages award is $246,892.47, and Drofa's award is $172,459.02.

---

[5] The Court would ordinarily apply the nine factors set forth in *Hodges v. S.C. Toof & Co*. to make this determination. 833 S.W.2d 896, 901–902 (Tenn.1992). However, none of the relevant factors for conducting that analysis are in the record, likely due to Jackson's failure to participate in discovery.

### F. Attorney's Fees and Costs

Last, Plaintiffs seek leave to prove costs and attorney's fees. They point out that the notes and the Tennessee Securities Act provide for the recovery of costs and attorney's fees. (ECF No. 85, 8.) The Court finds that the request is well-taken and **GRANTS** it. Plaintiffs shall have 14 days from the date of this Order's entry to file a document reflecting the time they worked on this case and the costs they incurred.

### V. CONCLUSION

Consistent with the foregoing, Plaintiffs' Consolidated Motion for Summary Judgment is **GRANTED IN FULL**. Plaintiffs are directed to file the relevant documents for their fee request within 14 days of the date of this Order's entry.

**IT IS SO ORDERED**, this 3rd day of April, 2024.

*s/John T. Fowlkes, Jr.*
JOHN T. FOWLKES, JR.
UNITED STATES DISTRICT JUDGE